**AMERICAN INFOAGE, LLC, et al., Plaintiffs,**

v.

**REGIONS BANK, Defendant.**

**CASE NO. 8:13–cv–1533–T–23TGW**

United States District Court, M.D. Florida, Tampa Division.

Signed July 9, 2015

Bernard Joseph Kurek, II, David J. Miller, Tampa Law Source, PA, Brian C. Chase, Meridian Partners, Tampa, FL, for Plaintiffs.

Andrew W. Lennox, Casey Reeder Lennox, Lennox Law, PA, Tampa, FL, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEVEN D. MERRYDAY, UNITED STATES DISTRICT JUDGE

This action results from three variable-rate loans by Regions Bank[1]—the Tampa

---

1. Regions is the successor in interest to Am-    South, which issued the loans. This order uses

loan, the Norcross loan, and the Sago loan. For each of the Tampa loan and the Norcross loan (collectively, the Infoage loans), American Infoage and Regions contracted for an interest-rate swap. According to the complaint, Regions misrepresented the terms of each Infoage loan, misrepresented the duration and the effect of each swap, misrepresented the consequence of pre-paying an Infoage loan, levied pre-payment penalties prohibited under the Infoage loans, over-charged the interest permitted under the Sago loan, and concealed material information and documentation about each Infoage loan. Thus, the plaintiffs sue for fraudulent misrepresentation (Count I), negligent misrepresentation (Count II), three breaches of contract (Counts III–V), unjust enrichment (Count VI), and two breaches of good faith and fair dealing (Counts VII, VIII). A September 25, 2014 order (Doc. 57) grants in part Regions' motion for summary judgment and denies the plaintiffs' motion for summary judgment. The order grants Regions' motion on Counts III, IV, VII, and VIII. After a June 6–12 bench trial, this order resolves the remaining counts.

## BACKGROUND FINDINGS

### 1. The Infoage Loans

On behalf of Infoage, Miller Cooper (Infoage's president) and Eugene Cunningham (an independent accountant who regularly assisted Infoage with financial matters) requested two fixed-rate loans, but Regions informed Infoage that Regions offered a fixed-rate only on a loan of less than a million dollars. Nonetheless, to substitute for two fixed-rate loans, Regions offered Infoage two variable-rate loans, each with a corresponding swap agreement.

Generally, a swap is an exchange of "cash flows"—a fixed-interest-rate "flow" and a variable-interest-rate "flow"—for a fixed duration. A variable-rate borrower can employ a swap to stabilize a loan's effective interest rate. Under a stabilizing swap, the borrower pays to, or receives from, the swap counter-party the difference between the borrower's variable-rate loan payment and the payment that the borrower would have paid under a fixed-rate loan. If the loan's variable rate exceeds the swap's fixed rate, the swap counter-party pays the difference to the borrower. But, if the swap's fixed rate exceeds the loan's variable rate, the borrower pays the difference to the swap counter-party. Typically, the variable rate fluctuates in accord with one of the benchmark rates recognized in the industry—in this case, the London Interbank Offered Rate or Libor.

A swap agreement is usually executed in association with a variable-rate loan. Thus, a swap and a corresponding loan usually mature simultaneously. However, as the September 25 summary judgment order holds and as the evidence at trial confirmed, a swap agreement is a distinct contract, physically separate and operationally independent from the corresponding loan. In fact, a person can enter a swap agreement without a corresponding loan, but Regions and most other banks allow a swap only in association with a loan.

Although a swap and a corresponding loan usually mature simultaneously, a borrower can—even at Regions—"mismatch" the loan and the swap. In other words, in accord with the terms, the swap can mature either before or after the loan matures. If the swap matures before the loan matures, the swap stabilizes the borrower's interest rate for the duration of the swap, and the borrower's interest rate varies for the remainder of the loan. If the swap matures after the loan, the swap

"Regions" to designate Regions and Am-                    South.

stabilizes the borrower's interest rate for the duration of the loan, and the swap operates as a stand-alone swap for the remainder of the swap.

A borrower can terminate a swap, but at termination one of the parties to the swap must pay the other a termination fee, i.e., a "swap breakage fee." If at termination the loan's variable rate exceeds the swap's fixed rate, the swap counter-party pays the borrower the swap breakage fee. If at termination the swap's fixed rate exceeds the variable interest rate, the borrower pays the swap counter-party the swap breakage fee. The greater the difference between the variable rate and the fixed rate, the greater the fee.

Because Regions allows a swap to exist only in association with a loan, a swap executed with Regions terminates if the borrower satisfies the loan before the swap matures. Accordingly, if the borrower satisfies the loan before the swap matures, a party to the swap must pay (and the counter-party will receive) the swap breakage fee. However, when a loan matures, the borrower usually re-finances the loan. At Regions, if the loan is re-financed, the swap can continue. Thus, a prudent borrower from Regions might select a swap that matures after the loan matures if (1) the borrower anticipates the loan's variable interest rate will have risen when the loan is satisfied or (2) the borrower plans to re-finance the loan and prefers the swap's fixed-rate guarantee to the risk that interest rates will have fallen.

When Regions proposed the swaps, neither Cunningham nor Cooper had experience with, or knowledge of, swaps. But, because Regions could not offer Infoage a fixed-rate loan, Infoage expressed interest in a variable-rate loan coupled with a swap. During a presentation on August 1, 2005, a Regions representative presented to Infoage an "Interest Rate Hedging Proposal," which explained to Infoage the basics of a swap. Regions lost the proposal slides (probably when Regions acquired AmSouth), but Infoage produced seven of the slides from the proposal.

As confirmed in the seven slides, the proposal included the following representations:

- For American Info Age, LLC., the swap will convert a variable rate loan into a fixed rate obligation.

- A swap is a separate contract from any loan agreement.

- The swap provides American Info Age, LLC. with an attractive two-way termination provision, which is better than the prepayment penalty typically assessed on a fixed rate loan.

(Exhibit 4 at 3) Further, in the *"Risks"* section, the proposal states, "The risk of the above swap transaction is that interest rates decrease, remain low, or only increase moderately, and American Info Age, LLC. pays more in interest expense than would have been the case under a variable rate facility." (Exhibit 4 at 5)

At trial, Eric Vogt, the Regions employee who negotiated the Infoage loans and swaps, testified that the trial exhibit is missing slides. Specifically, Vogt testified that the exhibit lacks a slide that described additional risks to the borrower, such as the risk that the borrower incurs a swap breakage fee for terminating the swap early by pre-paying the loan. Further, Vogt testified that during the proposal, because he so often in his career delivered essentially the same proposal, he would have noticed the absence of a slide. Thus, Regions argues that Cooper saw the missing slides. Both Cooper and Cunningham deny having seen a slide other than the seven slides in the trial exhibit.

Eventually, Infoage agreed to two, seven-year, variable-rate loans (the $3 million

Tampa loan and the $2.5 million Norcross loan) and to two, ten-year, corresponding swaps. The swap corresponding to the Tampa loan set a 7.43% fixed rate, and the swap corresponding to the Norcross loan set a 7.46% fixed rate. Each loan "reserved" Infoage's "right" to pre-pay the loan without a penalty, but each swap imposed a swap breakage fee for early termination of the swap agreement.

### 2. Sago Loan

In October 2005, Sago, which for purposes of this order is identical to Infoage, "obtained a revolving line of credit loan from [Regions] in the principal amount of" $2 million. (Exhibit 70 at 1) In October 2009, Sago "amended and restated" the Sago loan to increase the principal amount to $3 million and to convert the "revolving line" into "a non-revolving line of credit for a period of one year and then to automatically convert the same to a term loan." (Exhibit 70 at 1) The loan established a variable rate but allowed Regions to increase the rate if Sago defaulted on the loan. Later, Regions began charging Sago an elevated interest rate because Sago allegedly defaulted under the loan by not complying with the loan's business and executive financial disclosure requirements. Regions charged the elevated interest rate for the remainder of the loan.

### CREDIBILITY FINDINGS AND ADDITIONAL FACT FINDINGS

### 1. Cooper

The evidence demonstrates conclusively that Cooper, a savvy businessman with decades of experience, runs a profitable company that has never missed a loan payment. However, Cooper's explanation of the facts in this action assumes that Cooper committed Infoage to borrow millions of dollars without a working knowledge of the direct and immediate cash consequences of re-paying the loans, pre-paying the loans, re-financing the loans, or defaulting on the loans. Cooper is a precise and demanding, sometimes abrupt, manager who is highly attuned to cash flow, contingencies, economic soundness, and profit. Cooper either knew the content of the loan and swap agreements or chose willful ignorance, which the law equates to knowledge.

### A. Swap Agreement Terms

Cooper testified that for each swap agreement Vogt induced Cooper to sign a detached signature page without Cooper having seen the remainder of the agreement. Cooper argues that the agreements contained terms that differed from the terms that he negotiated and that, because Cooper never read the swap agreements, Cooper failed to notice the inconsistencies. Specifically, Cooper claims that he saw neither the breakage fee nor the ten-year duration in either swap agreement and that both the breakage fee and the ten-year duration are inconsistent with Vogt's representations.

Cooper's statement that he never read the swap agreements is improbable. Cooper is too experienced to have blindly signed loan and swap agreements associated with $4.5 million. Further, Cooper's testimony is improbable because Cooper signed a page that clearly states that Infoage might have to pay a swap breakage fee for pre-paying the loan. Specifically, Cooper signed an "ACKNOWLEDGMENT FORM," which is a one-page, three-sentence form that states:

> The undersigned hereby acknowledges that he/she understands that upon any early termination of a Transaction under the [swap] between the undersigned and AmSouth Bank ("Party A") . . ., monies may be owed by the undersigned to

Party A or by Party A to the undersigned.

A Transaction may be terminated early for a number of reasons, including without limitation, due to ... the Transaction having been prepaid in part or in full prior to the maturity of the Transaction.

(Exhibit 11 at REGIONS156)[2] Finally, Cooper's actions after signing suggest that he understood the duration of the swaps. Cooper testified that he discovered the swaps' true duration in 2012, when he attempted to pre-pay the Infoage loans. However, every month after the beginning of each swap, Regions sent to Infoage a one-page document for each swap entitled "NET SETTLEMENT ADVICE." (Exhibits 11, 12) Throughout approximately seven years, Regions sent Infoage nearly 150 "net settlement advices" that states "Attention: Miller Cooper." Each Tampa "net settlement advice" states "Effective Date: 15–Sep–05" immediately above "Maturity Date: 15–Sep–15." And each Norcross "net settlement advice" states "Effective Date: 15–Feb–06" immediately above "Maturity Date: 15–Feb–16." After receiving for almost seven years a twice-monthly "net settlement advice" identifying the ten-year swap duration, Cooper either knew the duration of each swap or chose willful or reckless ignorance, which the law equates to knowledge.

### B. Swap Desk

Cooper testified that, when he negotiated and signed the Infoage loans and the corresponding swap agreements, he spoke only to Vogt and not to Regions' "swap

desk." Cooper's testimony in this respect is mistaken, at least. Vogt testified that Cooper, like all parties to both a loan and a swap with Regions, necessarily spoke to Regions' swap desk, which establishes and describes to the borrower the terms of the borrower's loan and swap. Vogt's testimony that Cooper spoke to the swap desk is corroborated by Vogt's handwriting on Exhibit 3, which "outlines the general terms and conditions" of the approved Infoage loan offers. These terms are available only from, and are contemporaneously established by, the swap desk. For each Infoage loan, Vogt wrote the loan's amount, the loan's start day, the loan's first payment day, and, most importantly, the interest rate fixed under the loan's corresponding swap. The handwritten numbers correctly correspond to the Infoage loans and the swaps. Vogt convincingly testified that the rate fixed under the swap is a number that only the swap desk can quote to the borrower; thus, Vogt wrote the numbers on Exhibit 3 necessarily during a telephonic conversation between Cooper and the swap desk. Both practical necessity and Regions' unvarying institutional policy required a presentation from the swap desk to the borrowers and the bank's representative, Vogt in this instance.

### 2. Cunningham

Cunningham's most telling testimony occurred when he testified about his review of the loan. Cunningham (repeatedly) testified that he (repeatedly) insisted that each Infoage loan include both a fixed rate and no pre-payment penalty. Cunningham tes-

**2.** Cooper admits that he wrote his name, his title (president), and his signature on the form. But Cooper states that someone else wrote the "8/29/05" and "American Infoage, LLC" on the form. Cooper's statement is corroborated by the readily discernable difference in handwritings. Nonetheless, no party argues (and no evidence suggests) that either

addition is false (that is, that Cooper signed the document on another day or that Cooper is not the president of Infoage). Further, the evidence corroborates the additions—the exhibit has a fax stamp stating "Aug 29 05 04:04p SAGO NETWORKS," and Cooper testified that he is the president of Infoage.

tified that he had no knowledge that a swap agreement existed apart from the loan agreement. Instead, Cunningham purportedly thought that the swap agreement constituted a component of the loan agreement.

Cunningham testified that, when Regions presented him with the loan documents, he reviewed the documents for a "no pre-payment penalty" provision. Cunningham stated that the loan documents initially lacked the "no pre-payment penalty" provision and that Regions added the clause only at Cunningham's insistence.[3] Paul Presley (Regions' knowledgeable corporate representative) and Vogt each testified that the "no pre-payment penalty" provision is a standard component of every variable-rate loan, both at Regions and throughout the industry. James Moore (Regions' credible expert) confirmed that banks never charge pre-payment penalties under a variable-rate loan. Presley, Vogt, and Moore are more persuasive than Cunningham, who inexplicably is unaware of even this simple, common attribute of the modern loan agreement.

Further, Cunningham's testimony that he searched the promissory notes to verify that each loan contained a "no pre-payment penalty" provision is difficult to explain because Cunningham never verified the existence of a rate-fixing provision. Cunningham testified that he insisted that the loan contain a "no pre-payment penalty" provision and that the loan contain a fixed-rate provision. However, Cunningham inexplicably verified the existence of only one demand.

Regardless of whether Cunningham searched the promissory notes, Section 3(a) states, "3. **Interest Rate.** (a) Prior to the occurrence of an Event of Default, interest shall accrue on the principal bal-

ance outstanding from time to time under this Note at a rate per annum equal to the Libor Rate plus 250 basis points (2.50% per annum)." (Exhibit 50 at 1; Exhibit 55 at 1) Both Section 3(a), which facially conflicts with Cunningham's demand for a fixed rate, and the absence of a section fixing the loan's interest rate alert the reader to the presence of a variable interest rate tied to Libor. Also, Section 2(e) alerts the reader to the separate swap agreements:

> "ISDA Master Agreement" to means those certain ISDA Mater Agreements between Borrower and Lender, dated August 29, 2005, the schedule attached thereto and one or more confirmations issued in connection therewith, under the terms of which Lender and Borrower have entered into one or more of the following types of transactions: interest rate swap, cap, floor, collar or option.

(Exhibit 50 at 1; Exhibit 55 at 1)

Either (1) Cunningham failed to read the promissory notes and therefore never verified the presence of a clause forbidding a pre-payment penalty or (2), more likely, Cunningham reviewed the promissory notes and accepted the loans' variable rates because Cunningham understood that the swaps, which each appeared in a separate agreement, stabilize the loans' variable rates. In other words, Cunningham either knew about the swap agreement or chose reckless and willful ignorance, which the law equates to knowledge.

### 3. Regions' Witnesses

The testimony of each Regions witness, including Slava Moukhov (Infoage's accountant but Regions' witness), was quite credible, internally consistent, and consis-

---

**3.** The clause, which is located in Section 13, states, "**Prepayment of Principal.** Privilege is reserved to prepay at any time, without premium or fee, the entire indebtedness evidenced hereby or any part thereof." (Exhibit 50 at 7; Exhibit 55 at 7)

tent with the testimony of other Regions witnesses.

## DISCUSSION

### 1. Counts I and II: Fraud and Negligent Misrepresentation—Infoage

■ Counts I and II, claims for fraudulent and negligent misrepresentation, each allege that Regions falsely represented that "(a) the term of the Infoage loans would be 7 years, (b) given the size of the Infoage loans, interest stabilization could be achieved through utilization of an 'interest rate swap agreement,' and (c) there would be no premium or penalty for prepayment of the Infoage loans." (Doc. 44 at ¶¶ 13, 48, 55) A claim for fraudulent misrepresentation requires "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010) (internal quotation marks omitted). Like fraudulent misrepresentation, negligent misrepresentation requires a false statement of material fact. *Butler*, 44 So.3d at 105.

■ The September 25 order finds (and the evidence presented at trial confirms) that representations (a) and (c), above, are true. However, Counts I and II remain because a genuine issue of material fact remained about the truth of representation (b)—that interest-rate stability was achievable for Infoage by a swap.

Considered literally, the statement is trivially true. By stating that interest-rate stabilization "could be achieved" through a swap, Regions opined only on the general capability of a swap, not on the specific swap later chosen by Infoage. Not even David Holmes—Infoage's expert, whom Regions convincingly discredited—argues that a swap is incapable of stabilizing a borrower's interest rate. For example, Holmes's deposition (which the plaintiff read into the evidence) includes this exchange:

Q. So what are the potential benefits of a swap agreement to a borrower?

A. Stability. You're able to lock a rate in over a period of time that you know that you'll be able to pay. In a volatile rate environment, one wants to pay as little as possible and one wants to be able to budget over a period of time what their cost should be.

At trial, Presley, Moore, and Vogt agreed.

The evidence demonstrates not only that swaps "could" have stabilized Infoage's interest rates but also that the specific swaps that Infoage chose "actually" stabilized Infoage's interest rates. Both Moore and Presley—the only witnesses who demonstrated a comprehensive and cogent understanding of a swap—lucidly explained why the swaps in this action operated as intended and stabilized Infoage's interest rates.

Infoage argued that each swap failed to stabilize the corresponding loan's interest rate because each loan matured before the corresponding swap matured. For support, Infoage proffered David Holmes's expert testimony. However, Holmes's testimony, which proved somewhat confused and unhelpful to Infoage:

Q. So I'd like to summarize where we are on the issue of maturity dates. Based on your understanding of swap agreements and commercial loans, especially those loans that were generated prior to 2007, ... it is possible to achieve stabilized interest rates over the term of a commercial loan if the term of the loan and the term of the swap agreement are different, correct? It is possible?

A. Yes.

Q. Okay. So your statement in your expert report that "stabilized interest rates for the Loan Agreements would have required a corresponding interest rate swap agreement with a matched duration" is not correct, correct?

A. Well, looking in hindsight, yes.

Q. Okay.

A. And that's what I thought we were trying to establish here. If we're going from 2005 out, yes, it's possible. Looking hindsight, no, it wasn't possible given what happened in interest rates and the fact that there was nothing written around this to state what happens if interest rates break up or break down, whichever way.

Holmes appears to assert (1) that, although interest stabilization is "possible" without matching loan and swap maturations, a "writ[e] around" is required for interest-rate stabilization and (2) that neither swap in this action contained a stabilizing "writ[e] around." Holmes describes a "write around" as follows:

[Infoage's swap] is not exactly what one would do for interest rate stabilization. This allows for either a . . . break up or break down[ ] of the interest rates as time[ ] goes on. There was no real structure placed around this loan to stabilize the interest rates. This was just an open-ended swap, one swap with a fixed and a spot future on it that could go up or down depending on what happened with interest rates, and we saw what happened with the interest rates. There was no other piece in here that said, hey, if it broke to X or broke to Y, . . . there would be another hedge placed on it or there would be some sort of adjustment to the overall process.

. . . .

[T]he time value of money is X, right. And part of the lender's piece is to look at, if I'm in a mismatched swap, there is a risk attached to it, as we established earlier. Both of them are zero at start, but if I'm going three years farther on one side or the other, there should be some corresponding piece around this that says, hey, if it does X—and we don't know what X was at the time—but if it does X, this is what we should be doing. And this is just something that lenders should be cognizant of that the interest rates do change and that there is something here.

. . . [If the loan and swap were] even, it would have been fine because it just moved up and down. The fact that it was mismatched, you had a different timeframe on it, and there should have been some piece around this that said, hey, given the mismatch on this, here's an amendment or here's something that says this is what goes on because it's turned into a speculative hedge day one because you have two different durations.

In contrast, Presley and Moore lucidly discredited Holmes's testimony. For example, Moore testified specifically about Holmes's discussion of a "write around." Moore persuasively explained that "write around" is a term alien to swaps and that Holmes's use of the term demonstrates Holmes's unfamiliarity with swaps. Moore explained the same for Holmes's use of "matrix," which Holmes used elsewhere in his deposition. In other words, Moore explained that a swap expert uses neither "write around" nor "matrix" to discuss a swap.

Infoage's argument that each swap failed to stabilize the corresponding loan's interest rate is further discredited by the force of the transactional history. Infoage failed to show even one month when Infoage's interest rate differed from the stabilized rate for each loan (i.e., 7.43% for the Tampa loan and 7.46% for the Norcross loan). Further, neither Cooper nor

Cunningham nor Moukhov testified that Infoage ever paid a varying rate.

To the extent that Infoage argued that, if a swap matures after the corresponding loan matures, interest-rate destabilization occurs at the loan's maturation, Infoage is incorrect. As Moore and Vogt explained, Infoage paid a fixed rate throughout the life of the loan, and the swap breakage fee that Infoage paid at the end of the loan is not an interest payment. A swap breakage fee is akin to (although still somewhat different from) a loan pre-payment penalty, and a pre-payment penalty, like a swap breakage fee, is not an interest payment that effectively destabilizes the loan's interest rate.

## 2. Count VI: Unjust Enrichment—Infoage

Count VI asserts that the swap agreements are invalid and that under each "Infoage conferred a benefit upon Regions in the form of Infoage's payment of the Swap Breakage Fees, as well as excess interest paid during the life of these documents." (Doc. 44 ¶ 16) At trial, Infoage argued that each swap agreement is invalid (1) because Cooper signed the swap agreement's signature page without the remaining pages, (2) because the corresponding loan matured before the swap matured, and (3) because the swap agreement contained a breakage fee provision.

### A. Detached Signature Page

■ "Unless one can show facts and circumstances to demonstrate that he was prevented from reading the contract, or that he was induced by statements of the other party to refrain from reading the contract, it is binding." *Kinko's, Inc. v. Payne,* 901 So.2d 354, 356 (Fla. 2d DCA 2005) (Whatley, J.). Cooper testified that he read neither swap agreement because Vogt induced Cooper to sign detached signature pages without the rest of either agreement. Vogt says that he would not have presented Cooper with only the signature pages. As discussed above, Vogt's testimony is probably correct. Thus, the preponderant evidence is that Cooper signed each signature page with the rest of each agreement accessible.[4] Nonetheless, by whatever means Cooper signed the detached signature pages, the agreements contained the terms that Vogt described to Cooper.

### B. Mismatched Loan and Swap Maturation

Cooper testified that for each loan he selected a swap that matured at the same time that the loan matured. No Regions witness could remember and confirm Cooper's swap choices. But Regions' inability to produce a confirming witness is understandable. The parties negotiated the swaps nearly a decade ago, and the swaps and the loans were the ordinary course of business for Regions personnel at the time.

Cooper testified that he selected a seven-year swap because he had no intention to speculate on interest rates. Cooper testified that he wanted a fixed-rate loan and that he selected a swap only to approximate the fixed-rate loan that was otherwise unavailable. Cooper asserted that, if a

---

**4.** Infoage offered attorney Daniel Musca's testimony to corroborate Cooper's assertion that Cooper signed detached signature pages. Musca testified that, years after Cooper signed the agreements, at a meeting between Regions and Cooper, Regions produced a folder containing detached pages signed by Cooper. Musca argued from the witness stand that no one would detach a signature page in good faith. However, Vogt credibly explained that Cooper signed standard agreements that AmSouth had seen and signed many times before. When faxing the agreements to AmSouth, Vogt had no reason to include the many pages already familiar to AmSouth—he needed to send only the signature page.

swap matures after the corresponding loan, the borrower becomes a "speculator in interest rates." Certainly Cooper is a risk-averse borrower, but he mischaracterizes a swap that matures after the corresponding loan matures:

Moore convincingly explained why a risk-averse borrower—a borrower such as Cooper—might select a swap that matures after the corresponding loan matures. Moore testified that most loans, including the Infoage loans, have a "balloon" payment due at maturity. Because the borrower usually chooses not to pay the "balloon" payment, the borrower usually re-finances the loan when the loan matures. If the loan is re-financed, the borrower can transfer the swap to the re-financed loan. Thus, a risk-averse borrower usually prefers a swap that matures after the corresponding loan in order to stabilize both the original loan's and the re-financed loan's interest rates. Cooper's demonstrated aversion to risk suggests his likely attraction to, or at least preference for, a ten-year swap (Regions' longest swap) over a seven-year swap, even in conjunction with a seven-year loan.

Cooper's choice of ten-year swaps comports not only with his risk-averse business approach but also with his conduct. As discussed above, Regions sent Cooper approximately 150, one-page, "net settlement advices," each of which identified a ten-year swap duration, and Cooper never contacted Regions to object to the "mistake." Cooper's failure to object demonstrates by at least a preponderance of the evidence that Cooper saw the ten-year confirmation and failed to object because

he understood that he had selected a ten-year swap.[5]

### C. Swap Breakage Fee

Cooper and Cunningham testified that they each believed that the swap agreement contained no swap breakage fee. However, as discussed above, Cooper signed a one-page, three-sentence document (Exhibit 10) that explicitly states that he might have to pay a swap breakage fee. No further evidence is required. Nonetheless, a bullet in an August 1, 2005 presentation to Cooper stated, "The swap provides American Info Age, LLC, with an attractive two-way termination provision, which is better than the prepayment penalty typically assessed on a fixed rate loan." (Exhibit 4 at Infoage00389) In other words, the bullet states that, if the swap is terminated, one party to the swap will owe a termination fee to the other party. The possibility that the borrower could receive a payment for terminating the swap is "attractive" because under a standard fixed-rate loan the borrower receives no payment for pre-paying the loan. If Cooper could not understand the bullet (even in conjunction with the presenter's commentary), Cooper could have asked for clarification.

### 3. Count V: Breach of Contract—Sago

Count V alleges that the Sago loan "was a valid written contract between Sago and Regions during all material times" but that "[u]nbeknownst to Sago" Regions charged Sago an increased interest rate under the contract. (Doc. 44 ¶¶ 71, 76, 77) Count V admits that the Sago loan allowed for an

---

**5.** Cooper further discredited his testimony when he declared that he never understood that a swap could mature after the corresponding loan matures. Several documents presented to Cooper during the Infoage loan negotiations discuss the possibility of a loan–swap mismatch. A July 12, 2005 proposal and an August 29, 2005 "general terms" "outline" each state, "The term of the swap can be either seven years (matching the term on the loan), or for up to 10 years." (Exhibit 1 at Infoage00006; Exhibit 3 at REGIONS152) Cooper admitted that he read both documents.

increase to the interest rate "[u]pon the occurrence of an Event of Default," but Count V alleges that "Sago never engaged in any event and/or activity that constituted or was deemed to be an Event of Default." (Doc. 44 ¶¶ 74, 75)

At trial, Regions agreed that the Sago loan validly binds Sago and Regions and that the loan permits an increase to the interest rate if Sago defaults under the loan. However, Regions contested the remaining allegations, and the evidence conclusively favors Regions. The evidence at trial demonstrated (1) that throughout the imposition of the increased interest rate Sago continuously breached the contract and (2) that Regions warned Sago before, and notified Sago upon, increasing the interest rate.

The Sago loan identifies five categories of financial documents (e.g., Sago's tax returns and Cooper's annual personal financial statements) that the Sago loan required Sago to "deliver (or cause to be delivered) to" Regions periodically. (Exhibit 70 at 7) Cooper and Cunningham each admitted that Sago failed to timely send the documents to Regions. Indeed, Cunningham admitted to ignoring the disclosure requirements and to sending the documents only at Regions' continued and insistent request. Greg Hoerbelt, the Regions employee in charge of collecting the financial documents from Sago, confirmed Cunningham's admission and testified further that Sago remained in a constant state of default beginning before the imposition of the increased interest rate and continuing throughout the life of the loan.[6]

On July 22, 2011, an attorney representing Regions mailed Cooper and Cunningham a letter stating, "[Sago] has defaulted under the [Sago] Loan by, among other defaults, failing to submit the financial statements of [Sago] and guarantors as required under" the Sago loan. (Exhibit 15 at REGIONS1030) The letter declared that "Regions ha[d] the right to immediately impose the default rate of interest under the note of EIGHTEEN PERCENT (18%) per annum on the outstanding principal balance." (Exhibit 15 at REGIONS1030–1031) The letter allowed Sago to correct the default "by 5:00 p.m. Friday, July 29, 2011." (Exhibit 15 at REGIONS1031) Because, as Hoerbelt testified, Sago failed to correct the default, Regions increased Sago's interest rate and mailed Sago a "Commercial Loan Statement" that identified the "Rate Chg/Adjustment." (Exhibit 16 at Infoage00372)

## CONCLUSION

A September 25, 2014 order (Doc. 57) granted summary judgment in favor of Regions on Counts III, IV, VII, and VIII. This order holds in favor of Regions on the remaining counts (Counts I, II, V, VI). Accordingly, the clerk is directed (1) to enter judgment on each count in favor of Regions and against the plaintiffs and (2) to close the case. As discussed at trial, the plaintiffs' motion (Doc. 86) to amend the exhibit list is **DENIED**. Further, Regions' motion (Doc. 90) for judgment under Rule 52(c) is **DENIED AS MOOT**.

ORDERED in Tampa, Florida, on July 9, 2015.

---

**6.** Infoage raises no claim of waiver, custom and usage under the contract, or the like based on Regions' lengthy toleration of Sago's non-compliance with the disclosure requirement of the contract.